

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James H. Alesia | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7217 | **DATE** | August 20, 2002 |
| **CASE TITLE** | *Deborah Alexander vs. CIT Technology Financing Services, Inc.* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants defendant's motion for summary judgment [21-1]; denies plaintiff's motions *in limine* [30-1, 33-1]; grants in part and denies in part plaintiff's motion *in limine* [31-1]; grants defendant's motions *in limine* [35-1, 36-1, 37-1, 38-1, 41-1, 42-1, 43-1, 44-1, 45-1]; denies defendant's motions *in limine* [39-1, 40-1, 48-1]. Final judgment in this case is entered in favor of defendant CIT Technology Financing Services, Inc., and against plaintiff, Deborah Alexander. No motions for reconsideration will be entertained.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | AUG 21 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | 70 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| CW | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION



| | | |
|---|---|---|
| DEBORAH ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 01 C 7217 |
| | ) | |
| CIT TECHNOLOGY FINANCING | ) | Judge James H. Alesia |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court are (1) plaintiff's motions *in limine*; (2) defendant's motions *in limine*; and (3) defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the court (1) grants in part and denies in part plaintiff's motions *in limine*; (2) grants in part and denies in part defendant's motions *in limine*; and (3) grants defendant's motion for summary judgment on all counts.

## I. BACKGROUND[1]

Plaintiff Deborah Alexander ("Alexander") brought this suit against defendant CIT Technology Financing Services, Inc. ("CIT")[2] for sexual harassment, age discrimination, and

---

[1]Unless otherwise indicated, the following facts – taken from the parties' Local Rule 56.1 statements – are undisputed.

[2]On November 15, 1999, CIT acquired Newcourt. Effective October 1, 2001, CIT's name was changed to Tyco Capital Corporation. (Def.'s Corp. Disclosure Stmt. received Nov. 30, 2001.) Because defendant's name was CIT throughout most of Alexander's employment there, the court will refer to defendant as CIT.

retaliation. In order to understand this court's opinion, one must be aware of a number of facts. For the sake of clarity, a recitation of these facts is in seven sections. Section A discusses background information regarding Alexander's job responsibilities. Section B discusses Alexander's interactions with Sam Buono ("Buono"). Section C discusses Alexander's interactions with Troy Dillard ("Dillard"), including a September 15, 2000 meeting. Section D discusses Alexander's use of profanity in the workplace and with a customer. Section E discusses Alexander's interactions with Helen Griffin ("Griffin") and the January 24, 2001 town hall meeting. Section F discusses CIT's harassment and discipline policies, Alexander's reviews, and her termination from employment. Section G discusses Alexander's EEOC claim and the current lawsuit.

## A.     Background information regarding Alexander's responsibilities

Alexander was born December 29, 1950. She came to CIT in July 1999 through a temporary employment agency and was hired as a full-time employee on or about October 18, 1999, by Buono (then age 46), Director of Portfolio Quality. CIT operates a commercial equipment leasing operation called Lease Finance Group ("LFG") that is headquartered in Chicago and leases point of sale equipment to small and mid-size retailers throughout the United States. LFG maintains a Collections Department to recover delinquent lease payments. As a collector, Alexander was directly responsible for handling delinquent lease accounts, which included ensuring the collection of outstanding accounts by contacting lessees to develop information and facilitate payments.

When Alexander first began working as a temporary employee, Alexander heard from general talking in the ladies room that co-workers were calling her "lesbian" or "dike" because she did not go out for drinks and parties after work. Alexander believed the comments were made because she was "the new kid on the block." She told someone at her placement agency about the behavior, and that person said it would pass. Eventually the comments ceased.

## B. Alexander's interactions with Buono

In Spring 2000, Buono asked Alexander at different times who she was sleeping with and who she was dating. He repeatedly told her that she "couldn't handle him." He made similar comments to others. Buono also told Alexander that "he doesn't do his employees," and that he should fire her for the weekend and take her home because "he had some 500 milligram Viagra, he wanted to try them out, see how they worked." In response to these comments, Alexander replied, "yes, right" and walked away. Buono once commented about her "nice legs." In response, Alexander smiled and walked away. She said the comment was not a bad thing, but she also did not like it and it made her feel uncomfortable. Alexander did not complain to any supervisor or anyone in Human Resources about the comments.

## C. Alexander's interactions with Dillard, and the September 15, 2000 meeting

On September 15, 2000, Alexander was preparing to donate a kidney to her daughter, and Alexander asked to meet with Dillard, one of her supervisors, to discuss her work performance and her daughter's medical condition. Alexander experienced significant job stress in reference to her daughter, and she was troubled that her work performance was down and wanted to explain the situation to Dillard. Dillard met with Alexander alone in the CIT conference room.

3

Dillard told Alexander that: "You're a spoiled ass bitch and I'm tired of you;" "nobody gives a fuck about you or your family;" "I don't care about your daughter being sick;" "you're not going to have your way up here because they coddled you too much;" "you are too old to come to work with that shit;" and "if I thought I could get away with it, I'd slap the shit out of you." In response to Dillard's outburst, Alexander laughed and told him he could not talk to her that way. Dillard said, "if you say anything about it, I promise you, I'll have your job." Alexander documented what happened and stayed in her seat and laughed because Dillard took the entire crew out to lunch and did not return for the rest of the day. The next day, Alexander gave her handwritten account of the incident to Buono.

On September 20, 2000, Alexander met with Connie Mark ("Mark"), CIT's local Human Resources Manager, about the September 15 incident and gave her a copy of the document she prepared. Mark informed Buono of the situation, as she promised Alexander she would. Buono and Jason Glaum, another supervisor in charge of the "risk department," met with Dillard, explained Alexander's allegations, and counseled Dillard that his comments, if made, could be construed as harassment, were inappropriate, and violated CIT policy. Thereafter, Buono, Mark, Alexander, and Dillard met to discuss the situation, and both Alexander and Dillard were afforded an opportunity to state their sides of the story to Buono and Mark. In the meeting, Dillard admitted to being short with Alexander but denied the remaining allegations. Alexander said "that's not true," became angry, and did not say anything more. Following the meeting, Buono told Alexander that he had talked to Dillard, and he advised Alexander that she should come to him if she had any more problems. Buono cautioned Dillard that if his conduct recurred,

4

he would be subject to discipline. According to Alexander, after the meeting, Dillard told her, "I told you not to say anything about this, and I will get you," and he laughed with a little smirk and walked away. A couple weeks after the September 15 incident, Dillard told Alexander "As old as [you are], [you] should have been a supervisor, but [you] must be doing the wrong person, – oh, I mean the wrong thing." (Alexander Dep. at 91-92.) Dillard also told Alexander that she was not invited to after work parties because she was too old and did not want to come. He also made comments such as "you're old enough to be able to do this" and "you're old enough to know better."

Alexander believed that Dillard did not like her, that he ignored her, and that he did not answer her questions. For example, when the floor plan was reorganized, Dillard told Alexander he was going to move her from her window seat. Later, her seat assignment was changed to an aisle near the lunchroom. Also, on September 15, 2000, after the incident in the conference room, Dillard invited everyone in their area to lunch except Alexander. Alexander believed Dillard treated her this way because she was a woman that he did not like. She testified that Dillard treated Kendel Barry ("Barry"), another woman in the group, alright because Dillard and Barry were friends. According to Alexander, Dillard assisted everyone else in the work area except her because he did not like her. She felt he did not show her any compassion and never made her feel like she was a necessary part of the group or that he appreciated her working there. Also, Tommy Dunbar ("Dunbar"), another collector, heard Dillard tell Alexander that Dillard did not care whether Alexander's daughter lived or died.

In part because of personal stress, Alexander requested and was granted several leaves of absence. First, Alexander was off work from about September 22 until September 24, 2000, due to an ulcer flare-up. From September 15 until Alexander took leave, Alexander reported at least twice to Human Resources about age-based comments made by Dillard.[3] Then she was off work again from October 3 until November 6, 2000, due to a medical illness that Alexander claims was caused by nerves, her ulcer and depression. Alexander returned to work in the same position and for the same supervisor.

## D. Alexander's profanity in the workplace and with a customer

In November 2000, Griffin and Anthony Rogers ("Rogers") were promoted from collectors to supervisors in the Collections Department. Rogers had direct responsibility for supervising Alexander, and both Rogers and Griffin shared responsibility for supervising all the collectors on the floor. Griffin and Rogers reported to Dillard, who in turn reported to Buono. When Alexander first began working at CIT, Alexander was friendly with Griffin. Both worked as collectors then, and Griffin helped train Alexander. They rode the bus together in the morning, and went together for lunch, walks, and cigarettes. Griffin helped Alexander "over the rough spots" after Alexander first started working at CIT. When Griffin was promoted and returned to the Collections Department as a supervisor, her relationship with Alexander soured. Alexander told Griffin that she was an "arrogant shit" because Griffin's demeanor had changed.

---

[3]Alexander does not allege with specificity the substance of the comments she complained about. Rather, she merely sets forth a vague and conclusory allegation that she complained about "age-based comments." Because Alexander does not allege the substance of the comments, the court is unable to assess whether or not the comments were actually age-based.

Also, sometimes Alexander would go on break and vent to whoever would listen that management "didn't know what the fuck they were doing;" "this is fucked up;" "fuck that shit, I'm tired of this shit;" and "I'm grown, no one can tell me how to be a collector, I've done this for too long."

Then, Dillard received a written complaint dated January 2, 2001 from a customer, Sheri Cohen ("Cohen"), who stated that a collector – she did not know the collector's name -- was rude to her, refused to listen to her, refused to identify herself when Cohen asked for her name, hung up on Cohen, and called Cohen a "trailer trash motherfucker." According to CIT's automatic phone system records, only three phone calls were registered to Cohen's account number on the relevant date and time, and all three of the registered calls identified Alexander as the collector.

Collectors are expected to treat customers with courtesy and respect, and CIT prohibits employees from using profanity toward customers. Alexander admits that she used profanity in the workplace, referring to Buono as an "asshole" and Griffin as an "arrogant shit," using the words "fuck" and "shit" during her breaks, and saying "damn" when she hung up the phone with a customer. Barry, another collector who sat next to Alexander, testified that cursing in the workplace "wasn't a big thing," and she never heard Alexander curse at customers. Kaseem Harris ("Harris"), another collector who sat directly behind Alexander, testified that he never heard Alexander swear or use inappropriate language with customers. Rogers, Alexander's direct supervisor, monitored Alexander's telephone calls and was told by Griffin that Alexander used profanity once with a customer. Buono also testified that he heard Alexander use profanity once. Alexander's supervisors never wrote her up or disciplined her for use of profanity.

**E.** **Alexander's interactions with Griffin and the January 24, 2001 town hall meeting**

On January 24, 2001,[4] a "town hall" meeting was called for the Collection Department employees. All employees were expected to attend. If a collector was already on a work-related call when the meeting was called, the employee could finish the call and then the town hall meeting would begin. Employees were also permitted to leave a town hall meeting if, for example, it was necessary for them to use the restroom. Alexander left the town hall meeting to place a personal phone call to check on her grandson. According to Alexander, she routinely called to check on her grandson, and she obtained permission from Griffin to make the personal phone call. According to Griffin, she never gave Alexander permission to make the phone call. Griffin directed Alexander to terminate the call and return to the meeting, but Alexander refused. Griffin gave Alexander a chance to end the call, but Alexander still did not do so. Griffin then terminated Alexander's call by pressing the receiver button, and she directed Alexander to rejoin the town hall meeting.

Immediately after the meeting, Griffin told Dillard about the incident, and Dillard said he would take care of it. Griffin also reported the incident to Rogers via e-mail, carbon copying Buono and Dillard in the e-mail. That same day, Rogers, Griffin, and Dillard met to discuss possible repercussions, including termination, but no decision was made.

The parties dispute whether, following the town hall incident, Alexander made either of two threats to harm Griffin. With regard to the first threat, Harris testified that after Griffin

---

[4]In parts of their 56.1 statements, the parties state that this town hall meeting occurred on January 24, 2000. However, the evidence in support of their statements, including depositions and e-mails, indicate that this meeting occurred on January 24, 2001.

terminated the call, Alexander got upset and made a statement to the effect that if the event were to happen again, harm would come to Griffin. Harris called Alexander's statement a "release of emotion." Griffin was not in the vicinity and did not hear Alexander say anything when she terminated the call. Neither Buono nor Rogers heard this statement. With regard to the second threat, Dillard reported to Buono via e-mail that Alexander told him that if Griffin ever did something like that again, Alexander would "punch Griffin in the *!*!*!*!*!*!*! mouth." According to Alexander, she never told Dillard that she would punch Helen in the mouth if Helen terminated a call on her, and, in fact, Dillard would be the last person to whom she would make such a statement about threats to a supervisor.

**F.    CIT's harassment and discipline policies, Alexander's reviews, and her termination**

During Alexander's employment with CIT, CIT had a policy prohibiting harassment and discrimination based on, among other things, sex and age, as well as a complaint procedure for employees to report incidents of harassment and discrimination. Alexander asked for a copy of an employee's handbook or policy manual, but never received one. However, Alexander knew that CIT did not tolerate harassment or discrimination in the workplace, and she knew that if she had questions about a policy or a personal complaint she could go to her immediate supervisor, another member of management, or to Human Resources. Alexander went to Human Resources on several occasions regarding questions and complaints she had about her employment, including a complaint regarding the September 15, 2000 meeting with Dillard. Alexander also knew she could address harassment by telling the harassing employee that she found the behavior harassing and unwelcome.

CIT's discipline policy states that employees are subject to immediate dismissal without benefit of the corrective action process for certain types of activities, including, but not limited to: insubordination; disorderly conduct, including abusive, intimidating or threatening language which interferes with the performance of other employees; and conduct the company feels reflects adversely on the employee, CIT or clients. This same policy vests management with authority to take whatever action it deems in its sole discretion to be appropriate under the circumstances.

During January and February 2001, the managers and supervisors completed employee performance reviews. At the time Alexander's performance review was prepared in February 2001, no decision had been made regarding Alexander's discipline for the January 24, 2001 incident. On or about February 6, 2001, Rogers met with Alexander and presented her with a preliminary review of her performance for the year 2000. It was his practice to go over a performance review with the employee first, to get the employee's feedback and reaction and allow them to speak on their own behalf. The employee could then choose whether or not to sign off on the evaluation.

In her preliminary review, Alexander received a below average attendance rating due to "excessive use of sick days."[5] Alexander complained to Christina Mahon ("Mahon"), CIT's local Human Resources Manager, about the review. The next day, Alexander received a second

---

[5]In addition to being off work from September 22 until September 24, 2000 due to her ulcer flare-up, and being off work again from October 3 until November 6, 2000, due to her nerves, her ulcer, and depression, Alexander fractured her thumb and was absent from work from January 26 until February 5, 2001. She took time off from work again on February 14, 16, 22, and 26, 2001.

performance review that revised the rationale for the attendance rating to "unscheduled breaks." Alexander complained about the second review to Mahon. Mahon said she would give the second review to Buono. Buono never discussed Alexander's employee evaluation with Rogers, her direct supervisor. Buono said he would set up a time for Alexander to see him regarding her evaluation, but he never did. On about February 16, 2001, Alexander's final review was prepared. In the final review, Alexander received a below-average rating of "4" – "Needs Improvement" – in four of the five performance categories and a rating of "3" – "Meets Accountabilities" – in the remaining category of Job Knowledge. Alexander received the final review on February 21, 2001.

Also in February 2001, Buono, Dillard, Griffin, and Mahon contacted Kenneth Walton ("Walton") (age 46), CIT's Director of Human Resources, to discuss the January 24 incident. Buono decided that because of the severity of the January 24 incident and Alexander's previous performance, corporate Human Resources needed to be consulted. Buono instructed Dillard to follow-up on the matter with Walton, and Buono and Human Resources instructed Dillard to prepare a written warning or "write-up" of the January 24, 2001 incident. After Dillard prepared the write-up, Rogers reviewed it and assumed that Dillard had reviewed it with Alexander in accordance with the normal procedure. On about February 16, 2001, Walton received an e-mail from Dillard containing the "write up." After reviewing it, Walton recommended that Alexander be terminated. Walton sent an e-mail to Karen Cifrese ("Cifrese") (age 48), CIT Corporate Senior Vice President of Human Resources, and requested authorization to terminate Alexander's employment. On February 21, 2001, Cifrese decided to terminate Alexander's

employment. Dillard prepared the termination document, and Rogers signed it on behalf of CIT. On February 21, 2001, Alexander was terminated from employment with CIT for insubordination and threats.

### G.     Alexander's EEOC claim and the current lawsuit

Alexander filed a charge of discrimination with the EEOC on March 7, 2001. She amended this charge with the EEOC on March 9, 2001. Her amended charge alleges harassment, discrimination, and retaliation based upon her age and sex. On August 10, 2001, Alexander received a right to sue letter from the EEOC. On September 18, 2001, Alexander filed the current complaint against CIT. Count I alleges harassment based on sex; Count II alleges discrimination based on age; Count III alleges a wilful violation of 29 U.S.C. § 623; and Count IV alleges retaliation.[6] This court has subject-matter jurisdiction over Alexander's claims under 28 U.S.C. § 1331, as all counts arise under federal law.

On January 18, 2002, this court found that hostile work environment claims are valid under the ADEA and denied CIT's motion to dismiss Counts II and III of Alexander's complaint to the extent they seek recovery for age-based hostile work environment harassment. *Alexander v. CIT Tech. Fin. Servs.*, 82 Empl. Prac. Dec. P40,880 (N.D. Ill. 2002). This matter is currently before the court on CIT's motion for summary judgment on all counts.

---

[6]Both parties address harassment based on age and discrimination based on sex; however, the court will not address either of these allegations because they are not contained in Alexander's complaint.

## II. DISCUSSION

As a threshold issue, the court will dispose of the parties' motions *in limine* to establish what evidence is admissible and, therefore, properly before this court in support of CIT's summary judgment motion. Alexander brought three motions *in limine*. CIT brought twelve motions *in limine*. The court will address each party's motions *in limine* in turn.

### A.    Alexander's motions *in limine*

Alexander brought three motions *in limine* seeking to exclude the following: (1) any testimony, statement or affidavit of Lena Alexander; (2) testimony regarding Alexander's use of profanity in the workplace and with customers; and (3) the letter from Cohen to Dillard. CIT responded to each of Alexander's motions.

#### 1.    Lena Alexander

Alexander moves to bar any testimony, statement or affidavit of Lena Alexander. On May 1, 2002, Alexander filed a motion to bar witness Lena Alexander. On May 2, 2002, the court denied Alexander's motion to bar Lena Alexander because she is a rebuttal witness only. (Ct. Order dated May 2, 2002.) The current motion *in limine* is a verbatim restatement of the previous motion to bar. Therefore, the court denies Alexander's motion *in limine* to the extent that Lena Alexander will be a rebuttal witness only.

#### 2.    Alexander's use of profanity in the workplace and with customers

Alexander moves to exclude testimony and evidence by Griffin, Rogers, Dillard, and Buono regarding Alexander's use of profanity in the workplace and with customers as improper

character evidence and irrelevant to her termination for insubordination and threats. The court disagrees.

First, this evidence is not improper character evidence. Defendants concede that this evidence will not be used to prove that Alexander is a profane person or that she used profanity at some other time. Second, Alexander's use of profanity is relevant to the issues of whether her job performance was satisfactory and whether her work environment was objectively and subjectively hostile. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) ("[A]lleged discriminatory conduct cannot be considered in a vacuum; rather, an employee's claim must be evaluated in light of the social context in which events occurred."). Third, the court finds that this evidence would not be unfairly prejudicial or confuse the issues. Accordingly, the court denies Alexander's motion *in limine* regarding Alexander's use of profanity in the workplace and with customers.

### 3. Letter from Cohen to Dillard

Next, Alexander seeks to exclude from trial the letter from Cohen to Dillard. The letter complains that a collector – whom CIT identified as Alexander – treated Cohen rudely during a telephone call and called Cohen a "trailer trash motherfucker." Alexander argues that this letter constitutes inadmissible hearsay and does not fall under the business record exception to the hearsay rule. Alexander also argues that this letter is irrelevant to her termination for insubordination and threats.

Under the Federal Rules, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted." FED. R. EVID. 801(a). Hearsay statements are inadmissible unless an exception applies. FED. R. EVID. 802. Here, if Cohen's letter is being offered for the truth of the matter asserted, that Alexander was rude during a telephone call and called Cohen a "trailer trash motherfucker," then it is clearly hearsay. *Id.* Thus, the question is whether any hearsay exception applies or whether the statements in the letter are being offered for any purpose other than for the truth of what they assert.

Under Rule 803(6), records kept in the course of regularly conducted business activity are admissible. FED. R. EVID. 803(6). However, this exception does not encompass statements contained within a business record that are made by third parties. *Woods v. City of Chicago,* 234 F.3d 979, 986 (7th Cir.2000). "The fact that statements made by strangers to the business become a part of its records, such as the complaints which were placed in the ... files, does not make them business records unless they are verified by the business and thus adopted and become the business's own statements." *United States v. Santos,* 201 F.3d 953, 963 (7th Cir. 2000) (citing *United States v. Mitchell,* 49 F.3d 769, 778 (D.C. Cir. 1995)). CIT argues that Cohen's complaint was verified because CIT asked her to prepare the letter, examined its phone records to determine which employee made the telephone call, and subsequently began monitoring Alexander's telephone calls. The court disagrees with CIT. "If the records contain information obtained from a customer, thus constituting hearsay within hearsay, the information will come within the business records exception only 'if it is shown that [the business's] standard practice was to verify the information provided by [the] customer.'" *Mitchell,* 49 F.3d at 778 (quoting *United States v. Patrick,* 959 F.2d 991, 1001 (D.C. Cir. 1992)). For example, in *United*

*States v. Zapata*, 871 F.2d 616 (7th Cir. 1989), it was the hotel's standard practice to verify information provided by a registering guest by requesting the guest's business card or driver's license. *Zapata*, 871 F.2d at 625. CIT's "verification" of Cohen's complaint is not analogous to the verification of hotel guest registration forms in *Zapata*. CIT has not shown or argued that its standard practice was to verify information in customer complaints. Also, CIT has not shown that it verified anything other than the fact that the telephone records indicated that the only phone calls registered to Cohen's account number on the day in question identified Alexander as the collector. CIT has not shown that it verified the information provided by Cohen or the substance of Cohen's complaint, namely that Alexander was rude on the telephone to Cohen and called Cohen a "trailer trash motherfucker." Therefore, Cohen's letter does not fall under the business record exception. Because CIT has not presented any other exception which would admit the statements in the letter, they are inadmissible to show that in fact Alexander was rude to Cohen and called Cohen a "trailer trash motherfucker."

However, as CIT properly points out, evidence is admissible when it is being offered for purposes other than for the truth of the matter asserted. Here, Cohen's letter is admissible for other non-hearsay purposes, for example, to show a basis for CIT's belief that Alexander was rude to customers and used profanity when speaking with customers. Again, as stated *supra* Sect. II.A.2., Alexander's use of profanity is relevant to the issues of whether her job performance was satisfactory and whether her work environment was objectively and subjectively hostile. Accordingly, the court grants in part and denies in part Alexander's motion *in limine* regarding Cohen's letter to the extent that Cohen's letter is inadmissible to show that

in fact Alexander was rude to Cohen and called Cohen a "trailer trash motherfucker," but it is admissible if offered for purposes other than to prove the truth of the matter asserted in the letter. Specifically, the court finds that it is admissible to show a basis for CIT's belief that Alexander was rude and used profanity with customers.

**B.      CIT's motions *in limine***

CIT has brought twelve motions *in limine*. Defendants seek to exclude the following: (1) evidence or argument regarding Dillard or Buono's alleged use of alcohol or narcotics; (2) Alexander's written recollections of events in question; (3) Barry's statement; (4) Dunbar's statement; (5) evidence or argument regarding Alexander being called a "lesbian" or "dike;" (6) evidence or argument regarding Buono's comments about using Viagra; (7) evidence or argument regarding Buono's comments that Alexander "couldn't handle him;" (8) testimony by Tonya Smith; (9) testimony by Timothy Berry; (10) testimony by Dr. Jean Luc Benoit, or, in the alternative testimony by Benoit regarding the cause of Alexander's injuries; (11) the letter from David Dougan to Dillard; and (12) the Final Warning to Dillard. On July 25, 2002, this court granted CIT's motion to strike as untimely Alexander's responses to motions *in limine* 7, 8, 9, 10, 11, and 12. CIT did not move to strike Alexander's responses to CIT's motions *in limine* numbered 1, 2, 3, 4, 5, and 6.

With regard to CIT's seventh motion *in limine*, the court finds that – for reasons further explained *infra* Sect. II.D.1.– Buono's comments that Alexander "couldn't handle him," even if made outside the 300 day filing period, are part of the same actionable hostile environment claim under *Nat'l R.R. Passenger Corp. v. Morgan*, 122 S. Ct. 2061, 2073 (2002). Therefore,

the court denies CIT's seventh motion *in limine*. The court treats the remaining unopposed motions *in limine* as agreed and grants CIT's motions *in limine* numbered 8, 9, 10, 11, and 12. With regard to CIT's eighth and ninth motion *in limine,* Tonya Smith and Timothy Berry may be offered as rebuttal witnesses only. The court will address the remaining contested motions *in limine*.

### 1.     Dillard or Buono's alleged use of alcohol or narcotics

CIT seeks to exclude any testimony, evidence or argument regarding Dillard or Buono's alleged use of alcohol or narcotics as irrelevant, improper character evidence, and unfairly prejudicial. Alexander responds that this evidence is relevant because it shows the atmosphere and conditions at CIT and demonstrates that CIT's rules and policies were not enforced against Buono and Dillard.

The court agrees with CIT. Dillard and Buono's alleged use of alcohol or narcotics is irrelevant because this evidence does not have any tendency to make it more or less probable that Alexander was subjected to harassment, discrimination, or retaliation. Also, it would constitute improper character evidence to introduce evidence of their alcohol or narcotics use to demonstrate their temperance or to prove that Alexander was subjected to harassment, discrimination, or retaliation. Moreover, "there is considerable danger that evidence that a witness has used ... drugs may ... prejudice the jury ...." *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987). Even if this evidence were relevant, the court finds that its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues. Accordingly, the court grants CIT's first motion *in limine*.

## 2.    Alexander's handwritten notes

CIT moves to exclude as inadmissible hearsay and duplicative Alexander's handwritten

notes of (1) her alleged confrontation with Dillard on September 15, 2000, and (2) her February

meeting with Dillard and Rogers to discuss her second performance review. Alexander responds

that these notes are admissible under the present sense impression exception under Federal Rule

of Evidence 803(1) because she wrote these notes immediately following the incidents. She also

responds that these notes may be used to refresh her present recollection.

The Seventh Circuit recently explained:

> Rule 803(1) indicates that an out-of-court statement is not excludable as hearsay,
> whether or not the declarant is available to testify, if the statement "describ[es] or
> explain[s] an event or condition made while the declarant was perceiving the
> event or condition, or immediately thereafter." FED. R. EVID. 803(1). Courts have
> agreed on three principal criteria for the admission of statements pursuant to this
> rule: (1) the statement must describe an event or condition without calculated
> narration; (2) the speaker must have personally perceived the event or condition
> described; and (3) the statement must have been made while the speaker was
> perceiving the event or condition, or immediately thereafter. A statement that
> meets these requirements is generally regarded as trustworthy, because the
> substantial contemporaneity of event and statement minimizes unreliability due
> to defective recollection or conscious fabrication.

*United States v. Ruiz*, 249 F.3d 643, 646-647 (7th Cir. 2001) (internal quotations omitted).

There is no per se rule indicating what time interval is too long under Rule 803(1).

*United States v. Parker*, 936 F.2d 950, 954 (7th Cir. 1991). Here, however, Alexander provides

no evidence regarding either the time of her confrontations or the time she wrote her notes.

Therefore, Alexander has provided no evidence supporting her claim that these notes were

written "immediately thereafter" such that they could constitute present sense impressions. Even

if Alexander wrote these notes on the same days as the incidents, this does not mean that they

19

qualify as "immediately thereafter" under Rule 803(1). *See United States v. Carter*, 910 F.2d 1524, 1530-31 (7th Cir. 1990) (finding it proper to exclude a statement made only one hour after the event to which the statement pertained). Depending on how much time passed, Alexander may have had time to forget what actually happened or edit or revise her report. *See Santos*, 201 F.3d at 963 (finding a handwritten note inadmissible because it may have been intended as a reflective summary and characterization of conduct rather than a spontaneous reaction to an immediate sensation). Without further evidence regarding the times of the meetings and the times Alexander composed her notes, the court cannot find that Alexander's notes are the type of present sense impression that contain circumstantial guarantees of trustworthiness.

Accordingly, the court grants CIT's second motion *in limine* regarding Alexander's handwritten notes to the extent that these notes are inadmissible if offered to prove the truth of the matter asserted in them. They may be used to refresh her recollection.

### 3. Barry's statement

CIT moves to bar the introduction of Barry's statement because it is (1) hearsay and (2) duplicative and redundant. Alexander does not contest CIT's motion, but argues only that Barry's statement may be used for purposes of rebuttal and to refresh Barry's recollection. Accordingly, the court grants CIT's third motion *in limine* regarding Barry's statement to the extent that this statement is admissible for the nonhearsay purposes of rebuttal and refreshing recollection.

### 4. Dunbar's statement

CIT moves to bar the introduction of Dunbar's statement because it is (1) hearsay and (2) duplicative and redundant. Again, Alexander does not contest CIT's motion, but argues only that Dunbar's statement may be used for purposes of rebuttal and to refresh Dunbar's recollection. Accordingly, the court grants CIT's fourth motion *in limine* regarding Dunbar's statement to the extent that this statement is admissible for the nonhearsay purposes of rebuttal and refreshing recollection.

### 5. Alexander allegedly being called a "lesbian" or "dike"

CIT moves to bar any testimony, evidence, or argument regarding Alexander allegedly being called a "lesbian" or "dike" because it is (1) time-barred; and (2) irrelevant. Alexander began working at CIT on July 3, 1999, and these comments allegedly occurred about a week after she began working there and stopped after about two weeks. Thus, CIT argues that these comments are time-barred. CIT also argues that these comments are irrelevant because Alexander does not attribute them to a decisionmaker. The court finds that – for reasons further explained *infra* Sect. II.D.1.– comments about Alexander being a "lesbian" or "dike," even if made outside the 300 day filing period, are part of the same actionable hostile environment claim under *Nat'l R.R. Passenger Corp.*, 122 S. Ct. at 2073. Therefore, the court denies CIT's fifth motion *in limine*.

### 6. Buono's alleged comments about using Viagra

CIT moves to bar as irrelevant any testimony, evidence, or argument regarding Buono's alleged comments that he "doesn't do his employees," and that he should fire Alexander for the

weekend and take her home, in order to try out "some 500 milligram Viagra" and "see how they worked." CIT argues that these comments are irrelevant because Buono is not a decisionmaker, and therefore, his comments cannot support Alexander's claims of discrimination. Alexander argues these comments are relevant because Buono was a decisionmaker and these comments contributed to the hostile work environment. The court finds that these comments are relevant because they have a tendency to make it more or less probable that Alexander was subjected to harassment or discrimination. Accordingly, the court denies CIT's sixth motion *in limine* regarding Buono's Viagra comments.

## C.     <u>Summary judgment standard</u>

A motion for summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997).

The burden is on the moving party to show that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson*, 477 U.S. at 256. Once the moving party presents a prima facie showing that it is entitled to judgment as a matter of law, the non-moving party may not rest upon the mere allegations or denials in its pleadings but must

set forth specific facts showing that a genuine issue for trial exists. *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 256-57; *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989).

## D.    __Harassment based on sex__

CIT argues that Alexander's harassment claims based on conduct before July 18, 2000 are time-barred. It also argues that Alexander cannot establish a harassment claim because the conduct about which she complains was neither subjectively nor objectively hostile. Finally, CIT argues that it exercised reasonable care to prevent and correct any harassing behavior, and Alexander unreasonably failed to take advantage of CIT's corrective opportunities or otherwise avoid harm. The court will address each argument in turn.

### 1.    __Time-Bar__

In Illinois, an individual must initiate a discrimination claim by filing an EEOC charge within 300 days of the alleged discrimination. *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 353 (7th Cir. 2002). CIT argues that any incidents that occurred before July 18, 2000 – including the "dike" and "Viagra" remarks – are time-barred because they occurred more than 300 days before Alexander filed her charge of discrimination with the EEOC on March 7, 2001. As a preliminary note, 300 days prior to March 7, 2001 would be approximately May 10, 2000, not July 18, 2000. Second, as clarified by recent Supreme Court decision, a charge alleging a hostile work environment claim will not be time-barred, "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp. v. Morgan,* 122 S. Ct. 2061, 2073 (2002). As the Supreme Court

clarified, hostile environment claims differ from discrete acts because by their very nature, they involve repeated conduct, and

> [t]he 'unlawful employment practice' ... cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. ... Such claims are based on the cumulative affect of individual acts.

*Id.* (citations omitted). The court went on to explain that,

> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. ... It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days "after" the single unlawful practice "occurred." Given, therefore, that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.

*Id.* at 2074-75.

Even if the "dike" and "Viagra" remarks occurred outside the 300 day filing period, the court cannot conclude that they are not part of the actionable hostile environment claim. Therefore, the court finds that these comments are not time-barred.

## 2. **Hostile work environment**

Title VII is violated "'[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nat'l R.R. Passenger Corp.*, 122 S. Ct. at 2074 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Moreover, a hostile work environment is one that is 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Hilt-Dyson*, 282 F.3d at 463. "In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp.*, 122 S. Ct. at 2074 (quoting *Harris*, 510 U.S. at 23). "[T]he alleged discriminatory conduct cannot be considered in a vacuum; rather, an employee's claim must be evaluated in light of the social context in which events occurred." *Hilt-Dyson*, 282 F.3d at 463.

The relevant conduct regarding sex is: (1) in July 1999, co-workers in the ladies room called Alexander a "lesbian" or "dike" because she did not go out for drinks and parties after work; (2) in Spring 2000, Buono commented that Alexander had nice legs, asked Alexander who she slept with and who she was dating, told her she could not handle him; and told her that he does not "do" his employees and that he should fire her for the weekend and take her home to try out some 500 milligram Viagra; (3) in September 2000, Dillard told her, "As old as [you are],

[you] should have been a supervisor, but [you] must be doing the wrong person, – or, I mean the wrong thing," and called Alexander a "spoiled ass bitch."

Even assuming, without deciding, that Alexander subjectively considered her work environment to be hostile and abusive, the court finds that these remarks are insufficient to establish a hostile work environment claim because a reasonable person would not view this work environment as hostile or abusive. Several of the comments – including the comment regarding Viagra, being called a "spoiled ass bitch," and being told she was "doing the wrong person" – are indeed offensive, but these comments made over the course of more than a year were too isolated and sporadic to constitute severe or pervasive harassment. *See Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (finding comments such as "the only valuable thing to a woman is that she has breasts and a vagina" offensive but too isolated and sporadic to constitute severe or pervasive harassment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 356 (7th Cir. 1998) (holding that isolated incidents and offhand comments did not amount to hostile work environment); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-41 (7th Cir. 1995) (holding that a "handful of comments spread over months" did not add up to sexual harassment). As the Seventh Circuit recently stated, "[w]e are mindful that Title VII does not mandate admirable behavior from employers ...." *Patt*, 280 F.3d at 754. In other words,

> [s]imply put, Title VII does not prohibit all verbal or physical harassment in the workplace. Although a bright line does not exist separating innocuous from actionable behavior, this court has noted that isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment. The occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable.

*Hilt-Dyson*, 282 F.3d at 463 (citation omitted).

Here, the conduct, though offensive, falls short of "severe" or "pervasive" harassment. The environment that Alexander was subjected to was not so objectively offensive that it altered the conditions of her employment. The remarks complained of did not unreasonably interfere with her performance and are the sort of "mere offensive utterances" that are not actionable. *See e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) ("Hence, '[a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'") (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)); *Filipovic v. K&R Express Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (finding four national origin-related comments made over the course of more than a year insufficient because they did not unreasonably interfere with work performance). In sum, the court finds that the incidents were not so severe or pervasive as to constitute harassment. The court finds that there is no genuine issue of material fact and CIT is entitled to judgment as a matter of law on this claim. Accordingly, the court grants CIT's motion for summary judgment on Alexander's Count I sexual harassment claim. Because the court finds that the conduct about which Alexander complains did not constitute harassment, the court need not address whether CIT exercised reasonable care to prevent and correct any harassing behavior, or whether Alexander unreasonably failed to take advantage of CIT's corrective opportunities or otherwise avoid harm.[7]

---

[7]As stated *supra* Sect. I.F., Count I of Alexander's complaint specifically alleges harassment based on sex, and her complaint does not contain any allegation of harassment based (continued...)

## E.    Age Discrimination

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To succeed in an ADEA claim, a plaintiff must establish that she would not have received adverse treatment but for her employer's motive to discriminate on the basis of her age. *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir. 1996).

Discrimination may be established in either of two ways – through direct evidence or through the indirect burden-shifting method set forth in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973).[8] *See McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991). Direct evidence is "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 659 n.1 (7th Cir. 2001). Here, Alexander does not argue that there is any direct evidence

---

[7](...continued)

on age. Even if Alexander had alleged age-based harassment, the court finds that the relevant conduct regarding age – Alexander not being invited out by Dillard or her co-workers because she was too old to be involved; Dillard telling Alexander as old as she is she should have been a supervisor, that she was old enough to be able to do this, old enough to know better, and "too old to come to work with that shit" – are insufficient to establish an age-based hostile work environment claim. These isolated remarks are not so severe or pervasive as to alter the conditions of Alexander's employment and create an abusive working environment.

[8]The indirect method was formulated for Title VII cases, and the Supreme Court has never squarely addressed its applicability to ADEA claims. *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 142 (2000). However, both the Supreme Court and the Seventh Circuit recently have applied the indirect method to ADEA claims. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Franzoni v. Hartmarx Corp.*, --- F.3d --- , 2002 WL 1808333, at *3 (7th Cir. Aug. 8, 2002).

of discrimination; therefore, the court will examine Alexander's case under the *McDonnell Douglas* burden-shifting method.

Under *McDonnell Douglas*, a plaintiff must first establish, by a preponderance of the evidence, a prima facie case of employment discrimination. *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1006 (7th Cir. 2002). If the plaintiff establishes a prima facie case, then "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 931 (7th Cir. 1996). If the employer meets its burden, then the plaintiff must show, by a preponderance of the evidence, that the employer's stated reason for dismissal is nothing more than pretext. *Id.* CIT argues that Alexander's age discrimination claim fails as a matter of law because Alexander cannot satisfy the second, third, and forth elements of a prima facie case, and even if she could, she cannot prove that CIT's reasons for its actions were pretextual.

### 1. Alexander's prima facie case

To set forth a prima facie case of age discrimination, an employee must show that: (1) she was over forty years of age; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly-situated, substantially younger employees were treated more favorably. *Franzoni v. Hartmarx Corp.,* --- F.3d --- , 2002 WL 1808333, at *3 (7th Cir. Aug. 8, 2002). CIT does not dispute that, because Alexander was forty-eight years old when she began working at CIT, she has established the first element of the prima facie case. CIT contends, however, that Alexander has failed to establish elements two, three and four of her prima facie case.

### a. CIT's legitimate expectations

To satisfy the second element of the prima facie case, a plaintiff must demonstrate that her performance was satisfactory at the time of her alleged termination – not just at some time during her employment. *Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1262 (7th Cir. 1993). Although a plaintiff can establish this element through her own testimony that her performance was satisfactory, *Weihaupt v. Am. Med. Ass'n,* 874 F.2d 419, 428 (7th Cir. 1989), Alexander offers no testimony or affidavit showing that her performance was satisfactory at the time of her termination. Rather, Alexander argues merely that she communicated her concerns regarding her evaluation to Human Resources and to Buono. She also argues that Griffin, *if* she evaluated Alexander would have given Alexander an "average." Neither of these arguments establish that her performance was satisfactory at the time of her termination. Thus, Alexander has failed to establish that she performed satisfactorily. By not establishing element two of the prima facie case, Alexander has failed to meet her burden of establishing a prima facie case of discrimination.

Alexander also argues that the legitimate expectations prong of the prima facie test is not necessary to the analysis when the person judging the plaintiff's performance is the same person the plaintiff accused of discrimination. The Seventh Circuit has noted that when an employee concedes she is not meeting her employer's expectations but claims that she was treated more harshly than other rule-breakers, it "makes little sense in this context" to determine whether she was meeting her employer's legitimate expectations. *Curry v. Menard, Inc.,* 270 F.3d 473, 478 (7th Cir. 2001) (citing *Flores v. Preferred Technical Group,* 182 F.3d 512, 515 (7th Cir. 1999)).

However, this case is distinguishable from *Curry* and *Flores* because Alexander is not arguing that she was treated more harshly than other rule-breakers. Even if Alexander did make this argument, and even if the legitimate expectations prong was not necessary here, Alexander's claim would still fail because, as discussed *infra* Sect. II.E.1.b., she fails to establish that other similarly-situated employees who were not members of the protected class were treated more favorably.

### b.      Similarly-situated

Alexander sets forth no evidence or argument that younger similarly-situated employees were treated more favorably. By not establishing this element of the prima facie case, Alexander has failed to meet her burden of establishing a prima facie case of discrimination. *See Halloway v. Milwaukee County*, 180 F.3d 820, 827 (7th Cir. 1999) (finding that the plaintiff failed to meet his burden of establishing a prima facie case for his ADEA claim when he failed to establish he was treated differently from younger employees).

### 2.      Legitimate nondiscriminatory reasons

Furthermore, even if Alexander established her prima facie case, CIT has established a legitimate, nondiscriminatory reason for terminating her employment because of her use of profanity, her disrespect of and confrontations with management, her insubordination, and her threats to a supervisor. The undisputed evidence supports CIT's asserted legitimate nondiscriminatory reasons. As the Seventh Circuit has stated, the court will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. Northeastern Ill.*

*Univ.*, 153 F.3d 390, 396 (7th Cir. 1998). Thus, CIT has articulated a legitimate, nondiscriminatory reason for terminating Alexander's employment.

### 3. **Pretext**

Because CIT has established a legitimate, nondiscriminatory reason for its decision, Alexander must show that the proffered reason is pretextual. "'A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks.'" *Wells*, 289 F.3d at 1006 (quoting *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001)). To demonstrate pretext, Alexander must demonstrate that each of CIT's articulated reasons for her discharge either: "(1) had no basis in fact; (2) did not actually motivate her discharge; or (3) was insufficient to motivate her discharge." *Wells*, 289 F.3d at 1006. To demonstrate pretext, Alexander "must show more than that the employer's decision was incorrect; [Alexander] must also show the employer lied about its proffered explanation." *Johnson*, 260 F.3d at 732 (internal quotations omitted). *See Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) ("The mere fact that the employer acted incorrectly or undesirably ... cannot adequately demonstrate pretext."). Thus, Alexander's burden is to show that CIT lied when it stated that it believed Alexander used profanity, was disrespectful of and confrontational with management, was insubordinate, and threatened her supervisor. *See Velasco v. Ill. Dep't of Human Servs.*, 246 F.3d 1010, 1017 (7th Cir. 2001) (stating that a plaintiff cannot withstand summary judgment if she fails to create a triable issue of fact with respect to each of her employer's legitimate reasons). Alexander must "*specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Fed.*

*Sav. & Loan Ass'n*, 83 F.3d 833, 845 (7th Cir. 1996) (citation omitted) (emphasis in original). Conclusory assertions about a decisionmaker's prejudice are insufficient to establish pretext. *Wells*, 289 F.3d at 1007.

Alexander fails to address the pretext arguments in her briefs, and she makes no showing that CIT is lying about its proffered explanation. If anything, Alexander seems to argue that a pretext exists because she was not insubordinate and did not, in fact, threaten Griffin. Alexander's interpretations of incidents or her denials that they ever occurred do not address whether CIT honestly believed that Alexander was insubordinate and threatening. Again, pretext requires more than a showing that the business decision was mistaken, ill considered, or foolish, and so long as the employer honestly believed the reason given for the action, pretext has not been shown. *Franzoni*, 2002 WL 1808333, at *3 ("Although [the plaintiff] vigorously disputes the circumstances surrounding his medical leave and that he misrepresented his medical condition, he does not address the relevant question – whether [his employer] 'honestly believed' that [the plaintiff] was misrepresenting his medical condition."); *Nawrot v. CPC Int'l*, 277 F.3d 896, 907 (7th Cir. 2002) (finding that the plaintiff did not meet his burden of establishing pretext because his denials that incidents occurred and could not have provided the basis for his termination did not address whether his employer's determination that the incidents warranted termination were honestly held); *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) (citing cases for the proposition that "it is not enough for a plaintiff to show that [her] employer's explanation was based on an inaccurate assessment of its employee's performance."). It is CIT's belief that matters, and Alexander failed to present any evidence that CIT did not

33

honestly believe it was justified in terminating Alexander's employment because of her use of profanity, her disrespect of and confrontations with management, her insubordination and her threats to a supervisor. Therefore, Alexander has failed to rebut CIT's legitimate, nondiscriminatory reasons for her termination as a pretext for discrimination, and Alexander's age discrimination claim fails.

In sum, Alexander has failed to establish elements two and four of her prima facie case and has failed to show that CIT's proffered reasons were pretextual. Thus, the court finds that there is no genuine issue of material fact and CIT is entitled to judgment as a matter of law on this claim. Accordingly, the court grants CIT's motion for summary judgment on Alexander's Count II age discrimination claim and her Count III claim for a wilful violation of 29 U.S.C. § 623.[9]

### 4.    Retaliation

In *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002), the Seventh Circuit created "a new rule for the adjudication of retaliation cases." *Id.* at 644. According to *Stone*, a plaintiff can prove retaliation either using direct evidence or under the *McDonnell Douglas* framework. *Id.* Under the direct method, a plaintiff must show that she engaged in protected activity and suffered an adverse job action as a result. *Id.* Under the

---

[9]Again, as stated *supra* Sect. I.F., Count II of Alexander's complaint specifically alleges age discrimination, but her complaint does not contain any allegation of sex discrimination. Even if Alexander had alleged sex discrimination, this claim would fail because Alexander failed to establish that she performed satisfactorily, or that similarly-situated employees who were not members of the protected class were treated more favorably, and she has failed to rebut CIT's legitimate, nondiscriminatory reasons for her termination as a pretext for discrimination.

indirect or *McDonnell Douglas* method, an employee must demonstrate that: (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly-situated employees who did not engage in statutorily protected activity. *Hilt-Dyson*, 282 F.3d at 465 (discussing *Stone*). Under the indirect standard, the plaintiff "need not show even an attenuated causal link." *Stone*, 281 F.3d at 644. "Absent direct evidence of retaliation, failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim." *Hilt-Dyson*, 282 F.3d at 465.

At least twice since the publication of *Stone*, however, the Seventh Circuit has stated and followed the old rule for adjudicating retaliation cases: "[i]n order for a plaintiff to establish a prima facie case of retaliation under Title VII, [the plaintiff] was required to establish that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Wells*, 289 F.3d at 1008 (citing *Velasco*, 246 F.3d at 1017 n.6). *See Franzoni*, 2002 WL 1808333, at *4 (stating the same three-pronged test for establishing a prima facie case of retaliatory discharge in violation of the ADEA). In *Wells*, the sole reason the Seventh Circuit articulated for affirming the district court's grant of summary judgment on the retaliation claim was that the plaintiff failed to meet the third prong, because she failed to establish a causal link between the protected activity and an adverse employment action. *Wells*, 289 F.3d at 1008. In fact, the Seventh Circuit emphasized the necessity of a causal link when it stated that the plaintiff "failed to even attempt

to demonstrate the causal link ...." *Id.* Also, in *Franzoni*, the Seventh Circuit affirmed the district court's grant of summary judgment on the retaliation claim because – although there was no dispute that the plaintiff satisfied the first two prongs of the test – he did not establish the third prong, a causal connection. *Franzoni*, 2002 WL 1808333, at *4

Despite the confusion about the applicable legal standard, Alexander's claim fails whichever standard applies. First, Alexander's retaliation claim fails under the test set forth in *Stone* and reiterated in *Hilt-Dyson*. Alexander does not offer any direct evidence of retaliatory intent because she does not offer any "direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that [she] engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which [she] complains." *Stone*, 281 F.3d at 644. Therefore, Alexander must proceed under the indirect method of proof. Under the indirect method, Alexander's claim fails for the same reason her discrimination claim fails – she did not demonstrate that she was performing satisfactorily, *see supra* Sect. II.E.1.a., and she identified no similarly-situated employees who did not engage in protected activity and whom CIT treated more favorably, *see supra* Sect. II.E.1.b.. Because Alexander fails to prove two elements of her prima facie case, her retaliation claim fails. Even if Alexander had established her prima facie case, she has failed to establish that CIT's proffered nondiscriminatory, legitimate reasons for her discharge, *see* Sect. II.E.2., were pretextual, *see* Sect. II.E.3.. *See Franzoni*, 2002 WL 1808333, at *4 (finding that a plaintiff's retaliatory discharge claim failed because he was unable to establish pretext).

Second Alexander's retaliation claim fails under the test articulated in *Wells* and *Franzoni* because she establishes no causal link between her September 20, 2000 complaint to Human Resources regarding her September 15, 2000 confrontation with Dillard, and her employment being terminated five months later on February 21, 2001. "In order to establish a causal link between a protected activity and an adverse employment action, a plaintiff must demonstrate that the employer would not have taken the alleged adverse action 'but for' the plaintiff's protected activity." *Wells*, 289 F.3d at 1008. Alexander has failed to point to any evidence to support her argument that CIT would not have discharged her unless she had complained about Dillard's conduct. Further, Alexander has not shown that a suspiciously short period of time passed between her complaint about Dillard and her discharge. A five month time period is not sufficient to establish a causal link. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (finding a three month delay between a protected activity and an adverse employment action insufficient to establish causation); *Filipovic*, 176 F.3d at 398 (finding that four months negates causal inference); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (finding no causal inference when three months passed between the protected activity and the adverse employment action). Thus, Alexander has failed to establish a causal connection. Alexander's retaliation claim is further undermined by the weakness of her discrimination and sexual harassment claims. *See Hall*, 276 F.3d at 360 n.13 (stating that a retaliation claim is weakened by the absence of a discrimination or sexual harassment claim). Moreover, Alexander was unable to establish pretext, *see supra* Sect. II.E.3., and, thus her claim fails for this reason as well. *See Franzoni*, 2002 WL 1808333, at *4 (finding that plaintiff's retaliation claim failed because he did not establish pretext).

In sum, the court finds that there is no genuine issue of material fact and CIT is entitled to judgment as a matter of law on Alexander's retaliation claim. Accordingly, the court grants CIT's motion for summary judgment on Alexander's Count IV retaliation claim.

### III. CONCLUSION

For the foregoing reasons, the court (1) grants in part and denies in part Alexander's motions *in limine*; (2) grants in part and denies in part CIT's motions *in limine*; and (3) grants CIT's motion for summary judgment on all counts. Final judgment in this case is entered in favor of defendant CIT Technology Financing Services, Inc. and against plaintiff Deborah Alexander.

Date: AUG 2 0 2002

Judge James H. Alesia
United States District Court